PATRICK E. BREEN (BAR NO. 81579)
DAVID R. ZARO (BAR NO. 124334)
TED FATES (BAR NO. 227809)
KIM A. BUI (BAR NO. 274113)
ALLEN MATKINS LECK GAMBLE
  MALLORY & NATSIS LLP
515 South Figueroa Street, Ninth Floor
Los Angeles, California 90071-3309
Phone: (213) 622-5555
Fax: (213) 620-8816
E-Mail: pbreen@allenmatkins.com
        dzaro@allenmatkins.com
        tfates@allenmatkins.com
        kbui@allenmatkins.com

Attorneys for Plaintiff
THOMAS A. SEAMAN, Receiver

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

THOMAS A. SEAMAN, in his capacity as Court-appointed Receiver for INVESTORS PRIME FUND, LLC and IPF BANC SERVICING, LLC,

   Plaintiff,

v.

CALIFORNIA BUSINESS BANK, a California corporation;
RAFFI D. KRIKORIAN;
MICHAEL MALUCCIO;
COLE W. MINNICK, JR.;
JANE AUSERWALD;
PEGGY HANSEN;
MLADEN BUNTICH;
STEVEN HONG;
BIFF NAYLOR;
KENNETH THOMPSON;
GARY K. CROSS;
ELLWOOD JOHNSTON; AND
N. AARON YASHOUAFAR,

   Defendants.

Case No. CV13-02031

COMPLAINT FOR VIOLATION OF FEDERAL AND CALIFORNIA SECURITIES LAWS, FRAUD & DECEIT, NEGLIGENT MISREPRESENTATION, UNFAIR COMPETITION, AND CONSTRUCTIVE TRUST

Filed
MAY - 2 2013
RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE

## INTRODUCTION

1. Investors Prime Fund, LLC and IPF Banc Servicing, LLC (collectively, "IPF") purchased unregistered securities from Defendant California Business Bank ("CBB" or "Bank") on or about June 28, 2011, in reliance on the representations and statements made in the Private Placement Memorandum dated September 28, 2010 ("PPM") and issued by CBB in connection with a Private Placement Offering that occurred between September 28, 2010 and June 28, 2011.

2. Commencing on or about September 28, 2010, and continuing through June 28, 2011, CBB, and its officers and directors, issued false and misleading statements in CBB's PPM, in violation of federal and California securities laws, in connection with the Private Placement Offering of up to 3,333,334 shares of CBB common stock. The PPM misrepresented and inflated CBB's loan portfolio and thus overstated CBB's capital and book value by failing to disclose problems with numerous loans, including loans CBB made to its directors.

## JURISDICTION AND VENUE

3. The claims alleged herein arise under sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated by the Securities Exchange Commission ("SEC") (17 C.F.R. § 240.10b-5). In addition, this action is related to a case pending before this Court entitled *SEC v. Small Business Capital Corp., et al.*, Case No 5:12-cv-03237-EJD ("SEC Action"). Plaintiff Thomas Seaman ("Receiver") was appointed permanent receiver for Small Business Capital Corp., IPF, SBC Portfolio Fund, LLC, and their subsidiaries and affiliates in the SEC Action. In the SEC Action, this Court authorized the Receiver to pursue the claims asserted herein.

4. This Court has subject matter jurisdiction over this action pursuant to section 27 of the Exchange Act (15 U.S.C. § 77aa) and 28 U.S.C. section 1331 (federal question jurisdiction) and has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. section 1367(a) because they are related to claims within this Court's original jurisdiction.

5. Venue is proper in this judicial district pursuant to section 27 of the Exchange Act and 28 U.S.C. section 1391(b) because many of the acts and transactions giving rise to the violations of law complained of herein, including the purchase of securities by IPF, occurred in

this judicial district; defendants used the instrumentalities of interstate commerce, including wire and mail, in connection with the sale of unregistered securities in this district; the purchase of the unregistered securities were solicited from this district; and IPF sent payments to the defendants for the purchase of those unregistered securities from this district.

6. In connection with the acts, transactions and conduct alleged herein, defendants used the means and instrumentalities of interstate commerce, including the United States mails, and interstate wire and telephone communications.

## THE PARTIES

7. Investors Prime Fund, LLC is a California limited liability company. IPF Banc Servicing, LLC is a California limited liability company. IPF was put under the sole control and management of the Receiver pursuant to orders entered in the SEC Action. IPF purchased shares in CBB on or about June 28, 2011 and has been damaged as a result of Defendants' conduct as alleged herein.

8. CBB is a California banking corporation headquartered in Los Angeles, California. The Bank was originally incorporated under the laws of the State of California on April 28, 2005, and commenced operations on November 1, 2005. The Bank is insured up to the maximum legal limit under the Federal Deposit Insurance Act, but it is not a member of the Federal Reserve System.

9. Defendant Raffi D. Krikorian ("Krikorian") was the Chairman of the Board for CBB prior to, and during, the time the PPM and Private Placement Offering were pending.

10. Defendant Michael Maluccio ("Maluccio") was a Director of CBB prior to, and during, the time the PPM and Private Placement Offering were pending.

11. Defendant Cole W. Minnick, Jr., ("Minnick"), was CBB's Chief Executive Officer prior to, and during, the time the PPM and Private Placement Offering were pending.

12. Defendant Jane Auserwald ("Auserwald") was CBB's Chief Credit Officer prior to, and during, the time the PPM and Private Placement Offering were pending.

13. Defendant Peggy Hansen ("Hansen") was CBB's Chief Financial Officer prior to, and during, the time the PPM and Private Placement Offering were pending.

14. Defendant Mladen Buntich ("Buntich") was a Director of CBB prior to, and during, the time the PPM and Private Placement Offering were pending.

15. Defendant Steven Hong ("Hong") was a Director of CBB prior to, and during, the time the PPM and Private Placement Offering were pending.

16. Defendant Biff Naylor ("Naylor") was a Director of CBB prior to, and during, the time the PPM and Private Placement Offering were pending.

17. Defendant Kenneth Thompson ("Thompson") was a Director of CBB prior to, and during, the time the PPM and Private Placement Offering were pending.

18. Defendant Gary Cross ("Cross") was a Director of CBB prior to, and during, the time the PPM and Private Placement Offering were pending.

19. Defendant Ellwood Johnston ("Johnston") was a Director of CBB prior to, and during part of the time the PPM and Private Placement Offering were pending.

20. Defendant N. Aaron Yashouafar (Yashouafar") was a Director of CBB prior to, and during part of the time the PPM and Private Placement Offering were pending.

## SUBSTANTIVE ALLEGATIONS

21. <u>Consent Order</u>: As of March 18, 2010, CBB entered into a Consent Order with both the Commissioner of Financial Institutions and the Federal Deposit Insurance Corporation ("FDIC"). The Consent Order requires CBB, among other items and within certain time frames, to: (i) retain qualified management; (ii) maintain its Tier 1 capital leverage ratio to equal to or exceed 9 percent, on or before December 31, 2010, (iii) increase Tier 1 capital by $5 million and develop and implement a capital plan; (iv) not pay cash dividends or make any other payment to CBB's shareholders without the written consent of CBB's regulatory agencies; (v) reduce CBB's assets classified "Substandard" to not more than $7 million as of the FDIC visitation in the fourth quarter of 2010; (vi) adopt revised lending and collection policies; (vii) adopt a revised policy for determining adequacy of the ALLL; (viii) adopt a revised written liquidity and funds management policy; (ix) implement a written plan addressing retention of profits, reducing overhead expense and setting forth a comprehensive budget covering the period 2010 to 2012; (x) provide a written plan for eliminating CBB's reliance on brokered deposits; (xi) not establish any new branches or

other office without the prior written consent of the regulatory agencies; (xii) provide periodic reports to the regulatory agencies; and (xiii) provide CBB's shareholders with a description of the Consent Order.

22. <u>Recent Regulatory Examination</u>: Following an examination that occurred in the second quarter of 2010, the FDIC noted several areas of concern at CBB. As a result of that examination, the FDIC required CBB to raise additional capital. The FDIC also informed CBB that it might become subject to additional enforcement actions by regulatory agencies.

23. <u>Private Placement Offering</u>: On or about September 28, 2010, CBB began offering for sale a minimum of 1,666,667 shares, up to a maximum of 3,333,334 shares, of its common stock, no par value, at a price of $3.00 per share ("Private Placement Offering"). CBB reserved the right, in its sole discretion, to accept subscriptions for less than 3,333,334 shares, which was the maximum number of shares offered. Subscribers were required to purchase a minimum of 6,667 shares.

24. CBB made the Private Placement Offering for the purpose of raising capital for growth, enhancing CBB's capital position, complying with the provisions of the Consent Order, increasing lending limits, and for general corporate purposes. The Private Placement Offering was closed on or about June 28, 2011. On or about June 28, 2011, IPF purchased 330,000 shares of CBB common stock at $3.00 dollars per share for a total purchase price of $990,000. As an integral part of the Private Placement Offering, CBB prepared the PPM with the express intent that potential investors, including IPF, would rely on the PPM to provide full disclosure of the financial state of CBB and its loan portfolio as well as the risks entailed in buying CBB's stock.

25. <u>Loan Loss Reserve</u>: More specifically, during the first and second calendar year quarters of 2011, while the Private Placement Offering was pending and CBB was trying to raise capital, Defendants falsely represented in the PPM that CBB had $8,300,000 in Tier-1 capital. In making this representation, Defendants failed, among other things, to properly reserve for approximately $5,000,000 in loans that had been made primarily to three borrowers – the Maturin Group, Tom Dean, and CBB Director, N. Aaron Yashouafar. The collectability of these loans was highly questionable during the pendency of the Private Placement Offering and while the PPM

1 was available to potential investors. Yet CBB did not disclose this risk in the PPM. IPF learned, after the fact, that in many instances, CBB had not updated the loan files, the asset appraisals, and/or the financial statements for some or all of these borrowers for several years. Had Defendants properly recognized and adequately disclosed the problems with these loans, the PPM would have stated a loan portfolio that was at least $5,000,000 less than what was actually stated, and CBB would not have represented that it had $8,300,000 in Tier-1 capital.

26.  For example, one loan to Maturin Group for $1,000,000 had matured and not been paid off prior to CBB's issuance of the PPM. Two other loans to Maturin Group matured in December 2010 and were not paid off. Maturin Group filed bankruptcy in January 2011. The PPM made no reference to these loans or the defaults associated with them and was never updated to reflect the defaults that occurred in December 2010 or the bankruptcy.

27.  Tom Dean, who died in a plane crash in March 2011, had some $3 million in loans supported by unconventional collateral of questionable value, stale appraisals, and whose borrowers' financials and/or appraisals had not been updated for many years. The PPM made no reference to these loans, made no mention of the questionable collateral or the stale financials, and was never updated to reflect that Mr. Dean had died.

28.  Yashouafar, who resigned from the CBB Board effective March 31, 2011, had loans with CBB that were not properly collateralized (no updated or recent appraisals on property that CBB had made loans on in second position). One of Yashouafar's loans, on which he owed $1,900,000, matured in April 2011, but was not paid off. Yashoafar and a related entity's loans were extended or renewed without updated financials, credit information or appraisals on the collateral. CBB was also aware that the first position lender on the collateral properties recorded a notice of default against the properties, thus endangering CBB's collateral, which stood in a second position to the first position lender. The PPM made no reference to these loans or the defaults associated with them, made no mention that a Director of CBB had taken insider loans of almost $2,000,000 then defaulted on them, and was never updated to reflect that Yashouafar had resigned from the Board of Directors or that the $1,900,000 loan had matured but was not paid off.

29. In addition to the loans to Yashouafar, CBB made loans to Directors Cross and Maluccio. Approximately $830,000 was outstanding on these loans at the time IPF made its stock purchase. The PPM made no reference to these loans or the fact that they were made to insiders.

30. CBB also held a loan issued to D'Carillo's Ornamental in the amount of $330,000. CBB filed a notice of default against this borrower in December 2010. The PPM made no reference to this loan or the default, and no loan loss reserve for the loan was included in the financial statements attached to the PPM.

31. CBB also held a loan issued to David Shalom in the amount of $830,000. The loan matured in 2009. In September 2010, CBB obtained an appraisal of the collateral (a second position deed of trust on two multi-unit industrial buildings). The appraisal showed a loan-to-value ratio of over 95%. Accordingly, the Financial Accounting Standards Board standards (FAS 114) required CBB to implement a loan loss reserve of $236,141. CBB did not implement the reserve until June 30, 2011, *after* IPF's stock purchase. The PPM made no reference to this loan or the default, and no loan loss reserve for the loan was included in the financial statements attached to the PPM.

32. Although the events described above relating to the Maturin and Dean loans took place before IPF's purchase of its stock, CCB, operating through the individual Defendants, delayed in recognizing the charge-offs related to these loans until after IPF purchased its shares. CBB and the individual defendants did so in order to induce IPF to complete its purchase. In July 2011, retroactive to June 30, 2011, CBB implemented a charge-off of $1,000,000 directly against CBB's capital accounts for the Maturin Group and Tom Dean loans. The facts that lead to this charge-off were known by the individual Defendants prior to June 28, 2011, and before IPF made its stock purchase. This $1,000,000 charge-off resulted in a direct reduction in CBB's tangible book value of approximately $0.75 per share, less than a month after the close of the Private Placement Offering.

33. Defendants failed to disclose that it had made insider loans to Directors Yashouafar, Cross and Maluccio, and in particular that Yashouafar had defaulted on a $1,900,000 loan and resigned from the Board of Directors. Defendants also failed to disclose the problems

1 | associated with the D'Carillo's Ornamental and Shalom loans, or to include a loan loss reserve for
2 | these loans. Had these loans and the problems associated with them been disclosed and an
3 | appropriate reserve for them included in the financial statements attached to the PPM; the value of
4 | CBB's assets would have been materially reduced and CBB's Tier-1 capital would have been
5 | recognized at substantially and materially below the $8,300,000 million represented in the PPM,
6 | and CBB's book value would have been reduced to an amount substantially and materially below
7 | the $3.00 per share that IPF paid.

8 | 34. As a result of the examination of CBB's financial records conducted by CBB's
9 | regulators after June 2011, CBB was forced by its regulators to recognize approximately
10 | $3 million in losses on its loan portfolio; losses that Defendants should have recognized and
11 | disclosed to IPF prior to its stock purchase, pursuant to banking and accounting regulations
12 | applicable to CBB. These loan losses were the result of facts known by CBB and the individual
13 | Defendants, but not disclosed by them prior to June 28, 2011.

14 | **THE SAFE HARBOR PROVISION IS INAPPLICABLE**

15 | 35. The statutory safe harbor provides for forward-looking statements under certain
16 | circumstances, but that safe harbor does not apply to any of the false statements alleged herein.
17 | The statements in the PPM were not identified as "forward-looking statements" when made. To
18 | the extent there were any forward-looking statements, there were no meaningful cautionary
19 | statements identifying important factors that could cause actual results to differ materially from
20 | those in the purportedly forward-looking statements.

21 | 36. Alternatively, to the extent that the statutory safe harbor does apply to any forward-
22 | looking statements made, CBB is liable for those false forward-looking statements because at the
23 | time CBB made each of those forward looking statements, CBB knew that the particular forward-
24 | looking statement was false and/or the forward-looking statement was authorized and/or approved
25 | by an executive officer of CBB who knew that the statement was false when made or who
26 | concealed material facts regarding the falsity of the forward-looking statement.

## FIRST CLAIM FOR RELIEF

### For Violations of Sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5

### (Against All Defendants)

37. Plaintiff repeats and realleges every allegation in each of the foregoing paragraphs.

38. Defendants knowingly and/or recklessly engaged in acts, transactions, practices, and courses of business which operated as a fraud upon IPF and made various untrue and deceptive statements of material fact and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading to IPF.

39. Each of the Defendants knew or recklessly disregarded the fact that the above acts and practices, misleading statements, and omissions would adversely affect the integrity of the market in shares in CBB.

40. IPF has suffered substantial damages as a result of the wrongs alleged herein.

41. Defendants Krikorian, Maluccio, Minnick, Auserwald, Hansen, Buntich, Hong, Naylor, Thompson, Cross, Johnston and Yashouafar acted as control persons within the meaning of Section 20(a) of the Exchange Act, as alleged above.

42. Defendants Krikorian, Maluccio, Minnick, Auserwald, Hansen, Buntich, Hong, Naylor, Thompson, Cross, Johnston and Yashouafar had the power to influence and control, and did influence and control, directly or indirectly, the decision-making by CBB, including the content and dissemination of the various statements in the PPM that the Receiver contends were misleading.

43. By reason of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

44. By virtue of their positions as controlling persons, Defendants Krikorian, Maluccio, Minnick, Auserwald, Hansen, Buntich, Hong, Naylor, Thompson, Cross, Johnston and Yashouafar are liable pursuant to Section 20(a) of the Exchange Act.

45. As a direct and proximate result of Defendants' wrongful conduct, IPF suffered money damages of at least $990,000, the exact amount of which will be proven at trial, in connection with IPF's purchase of unregistered securities from Defendant CBB.

## SECOND CLAIM FOR RELIEF

### For Material Misrepresentation in Violation of

### California Corporations Code Section 25401

### (Against All Defendants)

46. Plaintiff repeats and realleges every allegation in each of the foregoing paragraphs.

47. As a result of the material misrepresentations, the Receiver is entitled, pursuant to California Code Section 25501, to rescind the above-described stock purchases and to have the $990,000 purchase price reimbursed.

48. Before entry of judgment, the Receiver will tender the 330,000 shares of the above-described securities as purchased from CBB and on which to date IPF has received no income.

## THIRD CLAIM FOR RELIEF

### For Joint and Several Liability of Management Principals under

### California Corporations Code Sections 25401, 25501, and 25504

### (Against Defendants Krikorian, Maluccio, Minnick, Auserwald,

### Hansen, Buntich, Hong, Naylor Thompson, Cross, Johnston, and Yashouafar)

49. Plaintiff repeats and realleges every allegation in each of the foregoing paragraphs.

50. Defendant Krikorian was, at the time of the acts alleged herein, a principal member of the management of CBB in that he was the Chairman of the Board for CBB.

51. Defendant Maluccio was, at the time of the acts alleged herein, a principal member of the management of CBB in that he was Member of the Board of Directors for CBB and Chairman of CBB's Loan Committee, and he replaced Krikorian as CBB's Chairman of the Board, a position that he currently holds as of the date of this Complaint.

52. Defendant Minnick was, at the time of the acts alleged herein, a principal member of the management of CBB in that he was CBB's President and Chief Executive Officer.

-9-

COMPLAINT

53. Defendant Auserwald was, at the time of the acts alleged herein, a principal member of the management of CBB in that she was CBB's Chief Credit Officer.

54. Defendant Hansen was, at the time of the acts alleged herein, a principal member of the management of CBB in that she was CBB's Chief Financial Officer until in or about May 2011.

55. Defendant Buntich was, at the time of the acts alleged herein, a principal member of the management of CBB in that he was a Member of the CBB Board of Directors.

56. Defendant Hong was, at the time of the acts alleged herein, a principal member of the management of CBB in that he was a Member of the CBB Board of Directors.

57. Defendant Naylor was, at the time of the acts alleged herein, a principal member of the management of CBB in that he was a Member of the CBB Board of Directors.

58. Defendant Thompson was, at the time of the acts alleged herein, a principal member of the management of CBB in that he was a Member of the CBB Board of Directors.

59. Defendant Cross was, at the time of the acts alleged herein, a principal member of the management of CBB in that he was a Member of the CBB Board of Directors.

60. Defendant Johnston was, at the time of the acts alleged herein, a principal member of the management of CBB in that he was a Member of the CBB Board of Directors.

61. Defendant Yashouafar was, at the time of the acts alleged herein, a principal member of the management of CBB in that he was a Member of the CBB Board of Directors.

## FOURTH CLAIM FOR RELIEF

**Fraud and Deceit**

**(Against All Defendants)**

62. Plaintiff repeats and realleges every allegation in each of the foregoing paragraphs.

**Misrepresentations of Material Facts.**

63. As alleged above, Defendants made representations and/or omissions of material fact to IPF before IPF purchased the unregistered securities of CBB.

64. Those representations were false.

65. The Receiver is informed and believes that Defendants knew that the representations and/or omissions were false when they made them or they made those representations or omissions recklessly without knowing whether they were true or false.

66. The Receiver is informed and believes that Defendants made those representations or omissions with an intent to defraud and deceive IPF, and Defendants made those representations or omissions to induce IPF to rely on them and to act in reliance on them.

67. When CBB made the representations and omissions, IPF was ignorant that the representations and omissions were false and believed them to be true.

68. IPF relied on these representations and omissions and as a result of those misrepresentations and omissions expended substantial sums of money.

69. Had IPF known the true facts, it would not have purchased unregistered securities from Defendants or invested in CBB.

**Suppression of Material Facts.**

70. The Receiver is informed and believes CBB knew the true, material facts concerning the investment and knew they were material to IPF, among other investors.

71. The Receiver is informed and believes CBB willfully and intentionally concealed and suppressed those material facts.

72. The Receiver is informed and believes CBB knew IPF did not know and could not reasonably discover these concealed and suppressed facts.

73. The Receiver is informed and believes Defendants intentionally concealed and suppressed these facts with the intent to defraud IPF, among other investors.

74. IPF was unaware of these concealed and suppressed facts and would not have acted as they did if they had known the concealed and suppressed facts.

75. Because of Defendants' superior position, and their possession of material facts which only they knew and which they knew IPF did not know, and their knowledge that these facts were material to IPF, Defendants had a duty to disclose these facts to IPF and to any other investors.

76. By virtue of their intentional misrepresentation and by virtue of their intentional concealment and suppression of material facts, Defendants fraudulently induced IPF to purchase securities.

**Damages.**

77. Defendants committed fraud on IPF, as a direct and proximate result of which IPF has suffered money damages in an amount which exceeds $990,000, the exact amount of which will be proven at trial.

78. The conduct of CBB, and the conduct of Krikorian, Maluccio, Minnick, Auserwald, Hansen, Buntich, Hong, Naylor, Thompson, Cross, Johnston and Yashouafar, who were, at all relevant times, managing agents of CBB, constitute intentional misrepresentations, false promises, deceit and suppression of facts known to Defendants, all with the intention of causing injury to IPF, and was oppressive, fraudulent, malicious, and despicable conduct as defined in California Civil Code section 3294, on the basis of which the Receiver should recover, in addition to actual damages exemplary and punitive damages according to proof at trial.

### FIFTH CLAIM FOR RELIEF

**Fraud and Deceit-For Rescission and Restitution Damages**

**(Against All Defendants)**

79. Plaintiff repeats and realleges every allegation in each of the foregoing paragraphs.

80. As a direct and proximate result of CBB's fraud and deceit, as set forth above, the Receiver is entitled to rescission and restitution damages, according to proof at trial, but no less than $990,000.00.

81. The conduct of CBB, and the conduct of Krikorian, Maluccio, Minnick, Auserwald, Hansen, Buntich, Hong, Naylor, Thompson, Cross, Johnston and Yashouafar, who were, at all relevant times, managing agents of CBB, constitute intentional misrepresentations, false promises, deceit and suppression of facts known to Defendants, all with the intention of causing injury to IPF, and was oppressive, fraudulent, malicious, and despicable conduct as defined in California Civil Code section 3294, on the basis of which the Receiver should recover, in addition to actual damages, exemplary and punitive damages according to proof at trial.

## SIXTH CLAIM FOR RELIEF

### Negligent Misrepresentation

### (Against All Defendants)

82. Plaintiff repeats and realleges paragraphs 1 through 56 and every allegation in each of these foregoing paragraphs.

83. CBB made representations to IPF about existing material facts.

84. The Receiver is informed and believes that those representations were false.

85. The Receiver is informed and believes that Defendants made those representations without a reasonable ground for believing them to be true.

86. The Receiver is informed and believes that Defendants made those representations with the intent to induce IPF to rely on them.

87. IPF was unaware of the falsity of the representations and acted in reliance on the truth of the representations and were justified in acting and relying on those representations.

88. As a result of its reliance on the truth of those representations, IPF has sustained and continues to sustain money damages according to proof at trial.

89. In engaging in the conduct alleged, Defendants made representations and statements of material facts and omitted to state material facts necessary to make statements that they made, in light of the circumstances in which they were made, not misleading and necessary to be stated in order that IPF would be informed of all material facts necessary for IPF's decision to purchase the shares. Defendants made such representations and statements with the intent to induce IPF to rely on them.

90. In making the representations and statements and omitting to state material facts, Defendants acted negligently in that they made those representations and statements without a reasonable ground for believing them to be true and did not exercise due care in investigating to determine the existence of the material facts omitted.

91. At the time of the representations, statements, and omissions, IPF was unaware that they were false and misleading and was unaware that there had been omissions of material facts. IPF justifiably relied on these representations and statements and justifiably believed that there

1 were no omissions of material facts. As a result, IPF was induced to purchase the unregistered
2 securities described above.

3     92.   As a direct and proximate result of the misrepresentations and omissions alleged,
4 IPF has suffered money damages in excess of $990,000.00 the exact amount of which will be
5 proven at trial.

6     93.   The conduct of CBB, and the conduct of Krikorian, Maluccio, Minnick,
7 Auserwald, Hansen, Buntich, Hong, Naylor, Thompson, Cross, Johnston and Yashouafar, who
8 were, at all relevant times, managing agents of CBB, constitute intentional misrepresentations,
9 false promises, deceit and suppression of facts known to Defendants, all with the intention of
10 causing injury to IPF, and was oppressive, fraudulent, malicious, and despicable conduct as
11 defined in California Civil Code section 3294, on the basis of which the Receiver should recover,
12 in addition to actual damages exemplary and punitive damages according to proof at trial.

## SEVENTH CLAIM FOR RELIEF

### Unfair Competition under Business & Professions Code Section 17200

### (Against All Defendants)

16     94.   Plaintiff repeats and realleges every allegation in each of the foregoing paragraphs.

17     95.   By their wrongful conduct, Defendants engaged in unfair competition within the
18 meaning of California Business & Professions Code section 17200.

19     96.   As a direct and proximate result of Defendants' unfair competition, the Receiver is
20 entitled to restitution damages according to proof at trial, but no less than $990,000.00.

## EIGHTH CLAIM FOR RELIEF

### Imposition of Constructive Trust

### (Against All Defendants)

24     97.   Plaintiff repeats and realleges every allegation in each of the foregoing paragraphs.

25     98.   The Receiver is informed and believes that Defendants have received moneys that
26 rightfully belong to IPF as a result of their purchase of the unregistered securities of CBB.

27     99.   By virtue of its investment in CBB, and through their purchase of unregistered
28 securities, IPF acquired a lien and security interest in any proceeds Defendants received from any

sales or transfers of any of the consideration paid by IPF for the unregistered securities, or in any other of CBB's assets or securities.

100. The Receiver is informed and believes that Defendants have wrongfully, unfairly, unjustly, and inequitably received, disbursed, and retained such proceeds for themselves.

101. Under the circumstances alleged, it is unfair, unjust, and inequitable to allow Defendants to retain any such proceeds.

102. In the interests of fairness, justice, and equity, this Court can and should issue an order and enter judgment:

    a. Imposing a constructive trust over all such proceeds;

    b. Decreeing that Defendants hold such funds in trust for the benefit of the Receiver; and

    c. Requiring Defendants to disgorge those funds and to restore those funds to the Receiver.

**WHEREFORE**, the Receiver prays for judgment as follows:

<u>For the First Claim for Relief</u>:

1. For compensatory damages in an amount to be proven at trial, but no less than $990,000.00;

2. For rescission of IPF's purchase of CBB stock and restitution in an amount to be proven at trial, but no less than $990,000.00 as the original consideration paid for the securities;

3. For pre-judgment interest on the original consideration at the legal rate from each date of purchase;

4. For imposition of a constructive trust on all moneys paid to CBB by IPF and on any and all proceeds received by any Defendants from any sale or transfer of the consideration paid by IPF or from any other sale or transfer of CBB's assets or securities after the dates of IPF's purchase of securities;

5. For costs and expenses incurred in this litigation, including reasonable attorneys' fees and other disbursements; and

6. For whatever further relief this Court deems to be just and proper.

For the Second Claim for Relief:

1. For rescission of IPF's purchases of CBB stock and restitution in an amount to be proven at trial, but no less than $990,000.00 as the original consideration paid for the securities;

2. For pre-judgment interest on the original consideration at the legal rate from each date of purchase;

3. For imposition of a constructive trust on all moneys paid to CBB by IPF and on any and all proceeds received by any Defendants from any sale or transfer of the consideration paid by IPF or from any other sale or transfer of CBB's assets or securities after the dates of IPF's purchase of securities;

4. For costs and expenses incurred in this litigation, including reasonable attorneys' fees and other disbursements; and

5. For whatever further relief this Court deems to be just and proper.

For the Third Claim for Relief:

1. For compensatory damages in an amount to be proven at trial but no less than $990,000.00;

2. For restitution in an amount to be proven at trial but no less than $990,000.00 as the original consideration paid for the securities;

3. For pre-judgment interest on the original consideration at the legal rate from each date of purchase;

4. For imposition of a constructive trust on all moneys paid to CBB by IPF and on any and all proceeds received by any Defendants from any sale or transfer of the consideration paid by IPF or from any other sale or transfer of CBB's assets or securities after the dates of IPF's purchase of securities;

5. For costs and expenses incurred in this litigation, including reasonable attorneys' fees and other disbursements; and

6. For whatever further relief this Court deems to be just and proper.

For the Fourth and Fifth Claims for Relief:

1. For compensatory damages in an amount to be proven at trial, but no less than $990,000.00;

2. For rescission of IPF's purchase of CBB stock and restitution in an amount to be proven at trial, but no less than $990,000.00 as the original consideration paid for the securities;

3. For pre-judgment interest on the original consideration at the legal rate from each date of purchase;

4. For imposition of a constructive trust on all moneys paid to CBB by IPF and on any and all proceeds received by any Defendants from any sale or transfer of the consideration paid by IPF or from any other sale or transfer of CBB's assets or securities after the dates of IPF's purchase of securities;

5. For exemplary or punitive damages in an amount to be proven at trial;

6. For costs and expenses incurred in this litigation; and

7. For whatever further relief this Court deems to be just and proper.

For the Sixth Claim for Relief:

1. For compensatory damages in an amount to be proven at trial, but no less than $990,000.00;

2. For rescission of IPF's purchase of CBB stock and restitution in an amount to be proven at trial, but no less than $990,000.00 as the original consideration paid for the securities;

3. For pre-judgment interest on the original consideration at the legal rate from each date of purchase;

4. For exemplary or punitive damages in an amount to be proven at trial;

5. For costs and expenses incurred in this litigation; and

6. For whatever further relief this Court deems to be just and proper.

For the Seventh Claim for Relief:

1. For rescission of IPF's purchase of CBB stock and restitution or disgorgement in an amount to be proven at trial, but no less than $990,000.00 as the original consideration paid for the securities;

2. For pre-judgment interest on the original consideration at the legal rate from each date of purchase;

3. For imposition of a constructive trust on all moneys paid to CBB by IPF and on any and all proceeds received by any of the Defendants from any sale or transfer of the consideration paid by IPF or from any other sale or transfer of CBB's assets or securities after the dates of IPF's purchase of securities;

4. For costs and expenses incurred in this litigation, including reasonable attorneys' fees and other disbursements; and

5. For whatever further relief this Court deems to be just and proper.

For the Eighth Claim for Relief:

1. For imposition of a constructive trust on all moneys paid to CBB by IPF and on any and all proceeds received by any Defendants from any sale or transfer of the consideration paid by IPF or from any other sale or transfer of CBB's assets or securities after the dates of IPF's purchase of securities;

2. For costs and expenses incurred in this litigation; and

3. For whatever further relief this Court deems to be just and proper.

Dated: May 2, 2013

ALLEN MATKINS LECK GAMBLE
MALLORY & NATSIS LLP

By: /s/ Ted Fates
TED FATES
Attorneys for Plaintiff
THOMAS A. SEAMAN, Receiver